Katrina H. TAYLOR, Plaintiff,

v.

FIRST NORTH AMERICAN NATIONAL BANK, Defendant.

Civil Action No. 2:03cv368–T.

United States District Court, M.D. Alabama, Northern Division.

July 16, 2004.

Christopher W. Weller, Capell Howard PC, James N. Walter, Jr., Capell Howard PC, Wyndall A. Ivey, Capell Howard PC, Montgomery, AL, George C. Douglas, Jr., Birmingham, AL, Jerry L. Thornton, Law Office of Jerry L. Thornton, Hayneville, AL, for Plaintiff.

Charles Nelson Gill, Richard Hamilton Gill, Copeland Franco Screws & Gill, Montgomery, AL, Sean Patrick Burke, Theodore R. Scarborough, Sidley Austin Brown & Wood, Chicago, IL, for Defendant.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Katrina Taylor brought this lawsuit against defendant First North American National Bank in an Alabama state court, alleging violations of the federal Fair Credit Billing Act (FCBA), 15 U.S.C.A. §§ 1666–1666j, as enforced by

the Truth in Lending Act (TILA), 15 U.S.C.A. § 1640. First North American removed this action to this court pursuant to 28 U.S.C.A. §§ 1441 and 1446; this court has jurisdiction under 28 U.S.C.A. § 1331. First North American has filed a motion to stay the proceedings and compel arbitration under the Federal Arbitration Act (FAA), 9 U.S.C.A. § 1–16; in turn, Taylor has filed a motion seeking a jury trial on the question of whether an agreement to arbitrate exists between her and the bank. The court will grant First North American's motion and deny Taylor's motion.

## I. BACKGROUND

Taylor applied for a Visa credit card from First North American over the telephone in September 1999. The bank mailed Taylor a card and a cardmember agreement on September 15. Taylor confirmed her receipt of the card and activated her account on September 21. She first used her Visa card on October 16, 1999, and last used it on December 12, 2002.

The card member agreement included three provisions relevant to the instant motions. Paragraph 17 of the agreement states that Georgia and federal law will govern the agreement.[1] Paragraph 19 governs changes in the terms of the agreement; it provides as follows:

"Upon such prior written notice as is required by applicable law, we may change the terms of this Agreement. In such event, to the extent permitted by applicable law, the new terms shall apply to your Account balance at the time of the change and to future charges. However, you may avoid the new terms if you surrender your Card by mailing it

to us ... prior to the effective date of the change, in which event you may continue to pay off your Account balance under the same terms and conditions as in effect. Failure to surrender your Account Card prior to the effective date of the change will constitute your consent to the change in terms." [2]

Paragraph 24 governs mediation and arbitration; in relevant part, the arbitration clause provides as follows:

"This section applies to any claim, dispute or controversy arising from or related either to this Agreement or the relationships that result from this Agreement....

"*Mediation.* Either you or we may request that a claim be submitted to nonbinding mediation....

"*Arbitration.* Except as provided below, you and we agree that any claim that is not resolved through the nonbinding mediation process outlined above shall be resolved by binding arbitration conducted by and according to the Code of Procedure of the National Arbitration Forum in effect at the time the claim is filed. Filing fees shall be paid by the party filing a claim, and other fees will apply as stated in such Code of Procedure...." [3]

On March 13, 2003, Taylor filed this lawsuit—individually and on behalf of all other similarly situated holders of credit cards issued by First North American—in the Circuit Court for Lowndes County, Alabama. Taylor alleges that the bank violated the FCBA, 15 U.S.C.A. § 1666c, and the regulations promulgated to enforce the act, by not posting payments received after 10:00 a.m. to a customer's account until the following day.

---

**1.** Defendant's motion to compel arbitration, etc., filed May 13, 2003, exh. 1, declaration of Susan Hewitt, exh. A., First North American National Bank VISA Agreement (agreement), ¶ 17.

**2.** *Id.* at ¶ 19.

**3.** *Id.* at ¶ 29.

First North American removed this action to federal court under 28 U.S.C.A. §§ 1441 and 1446, and filed a motion pursuant to the FAA, 9 U.S.C.A. §§ 1–16, to stay these proceedings and to compel arbitration. Taylor responded with a motion for jury trial jury on the question of whether an agreement to arbitrate exists between her and the bank.

## II. THE FAA

The FAA makes enforceable a written arbitration provision in a "contract evidencing a transaction involving commerce." 9 U.S.C.A. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). The legislative history makes clear that the FAA's purpose was to overcome the historic judicial hostility to arbitration agreements and to enforce such agreements. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 n. 14, 105 S.Ct. 3346, 3353 n. 14, 87 L.Ed.2d 444 (1985); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

The FAA provides that, if a lawsuit in federal court has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C.A. § 3.

The FAA also provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another party to arbitrate under a written agreement for arbitration may petition [the court] ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C.A. § 4. Section 4 goes on

to provide that, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*

As a general matter of federal policy, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 651, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (reviewing dispute arising under the Labor Management Relations Act) (internal quotation omitted); *see also Ruby–Collins, Inc. v. City of Huntsville, Alabama*, 748 F.2d 573, 576 (11th Cir.1984) ("[F]ederal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration.").

Despite this presumption favoring arbitration, the FAA prohibits the enforcement of an arbitration clause that is invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. Section 2 "gives States [ ] method[s] for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision." *Allied–Bruce Terminix v. Dobson*, 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995).

While federal policy favors arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Accordingly, "[t]he

question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (quoting *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)). Issues to be decided by the court "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, ——, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003).

As a general rule, when considering these "gateway issues," the court "may consider only issues relating to the making and performance of the agreement to arbitrate," and not issues relating to the making of the contract generally. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *John B. Goodman Limited Partnership v. THF Construction Co.,* 321 F.3d 1094, 1095–96 (11th Cir.2003) (per curiam). *"Prima Paint's* mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator." *Rollins, Inc. v. Foster,* 991 F.Supp. 1426, 1431 (M.D.Ala.1998) (Thompson, C.J.).

There is an exception to the *Prima Paint* rule, however, for "cases where not merely the enforceability, but the initial formation or existence of a contract, including a disputed arbitration clause, is legitimately called into question, and must be decided by the court." *Rainbow Investments, Inc. v. Super 8 Motels, Inc.,* 973 F.Supp. 1387, 1390 (M.D.Ala.1997) (Thompson, C.J.). Cases in which there is no signed contract and in which one party denies the existence of an agreement fall into this category. The Eleventh Circuit has explained:

"Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. Because the making of the arbitration agreement itself is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests.

"The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of any agreement, including the existence of an agreement to arbitrate. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act. If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitration at all. Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language."

*Chastain v. The Robinson–Humphrey Co.,* 957 F.2d 851, 855 (11th Cir.1992) (citations and footnotes omitted).

In resolving these "gateway issues," the court applies ordinary state common law governing the formation of contracts. *Volt*

*Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 n. 9, 115 S.Ct. 1212, 1219 n. 9, 131 L.Ed.2d 76 (1995).

## III. DISCUSSION

There is no dispute in this matter about whether Taylor's claims are covered by the purported arbitration agreement. Rather, the dispute is about the existence of an arbitration agreement in the first place and whether that agreement can be enforced.

First North American's argument is straightforward. It argues that the cardmember agreement includes a valid, written agreement to arbitrate that clearly encompasses Taylor's claim. Therefore, the bank argues, the court is required to stay this litigation and compel arbitration under the FAA. 9 U.S.C.A. §§ 3 & 4.

Taylor makes three categories of arguments in response. First, she argues that no arbitration agreement exists. Second, she argues that, even if an arbitration agreement does exist, federal law provides that it cannot be enforced because its provisions will prevent her from vindicating her statutory rights. Third, she argues that the arbitration agreement cannot be enforced because its terms are unconscionable under Alabama law.

### A. Existence of an Arbitration Agreement

Taylor makes four specific arguments to the effect that no agreement to arbitrate exists between her and First North American. She argues that (1) there is no evidence that the cardmember agreement was mailed or delivered to her; (2) she was not given meaningful notice that the cardmember agreement contained an arbitration agreement; (3) the cardmember agreement did not provide a reasonable

mechanism for her assent; and (4) the bank's right to change the cardmember agreement unilaterally makes it unenforceable. Related to these issues is Taylor's motion for a jury trial on the issue of whether an agreement to arbitrate was made.

#### 1. Delivery of the Cardmember Agreement

Taylor's first argument is that First North American has not established that her cardmember agreement was ever mailed or delivered to her, and that, therefore, no arbitration agreement exists between her and the bank. The facts do not support Taylor's claim.

As stated above, as a general rule, arguments that go to the validity of a contract as a whole are left for the arbitrator. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *John B. Goodman Limited Partnership v. THF Construction Co.,* 321 F.3d 1094, 1095–96 (11th Cir.2003) (per curiam). Taylor's claim that she never received a copy of the cardmember agreement would presumably invalidate not only the arbitration agreement but also the cardmember agreement as a whole. Thus, at first glance, it appears that this is an argument for the arbitrator to resolve.

■ Taylor's claim that she never received the cardmember agreement can be resolved by the court, however, because it calls into question the formation or existence of the cardmember agreement that includes the agreement to arbitrate and is thus within the exception to the *Prima Paint* rule. *Chastain v. The Robinson–Humphrey Co.,* 957 F.2d 851, 855 (11th Cir.1992); *Rainbow Investments, Inc. v. Super 8 Motels, Inc.,* 973 F.Supp. 1387, 1390 (M.D.Ala.1997) (Thompson, C.J.). This exception applies with particular force when, as in this case, there is no signed contract requiring arbitration. *Chastain,* 957 F.2d at 855.

■ Taylor points out that the first declaration filed by Susan Hewett, a First North American employee, which the bank offers as evidence of the existence of the agreement, does not actually state that the bank mailed or delivered the agreement.[4] Taylor also states that her affidavit "denies receiving or assenting to the Card Agreement."[5] Taylor concludes that, "[s]ince [First North American] offers no signed agreement which would evidence receipt and assent, its motion to compel should be denied summarily."[6]

■ The totality of the factual record, however, shows that the cardmember agreement was mailed to Taylor. The law recognizes a rebuttable presumption that an item properly mailed was received by the addressee. *Konst v. Florida East Coast Ry.*, 71 F.3d 850, 851 (11th Cir.1996). In her original declaration, Hewitt stated that "the attached Card Agreement and subsequent changes in terms applicable to Taylor's [First North American] account are true copies of the documents actually identified in Taylor's [First North American] Account notes as having been issued to Taylor."[7] Hewitt also filed a supplemental declaration that relates the bank's standard procedure of including an agreement with the card mailed to new account holders and that states that no mail sent to Taylor has ever been returned to the bank.[8] The court can thus presume that Taylor received the agreement and subsequent changes in terms.

Moreover, in her own affidavit, Taylor does not actually deny that she received the agreement. She states that when she applied for her card, no one mentioned anything to her about arbitration or gave her "any written materials which called [her] attention to arbitration," and she states that "when [she] received [her] credit card from [the bank], nothing in anything [she] received with the card, or on the card itself, or on the envelope it came in, called [her] attention to any waiver of legal rights or remedies or the arbitration of disputes."[9] This statement, however, is not a denial that she received the agreement; rather, she only denies that her attention was called to the arbitration provision within the agreement. Thus, the agreement was mailed and delivered to Taylor.

## 2. Meaningful Notice

Taylor next argues that no arbitration agreement exists because she was not given meaningful notice that the cardmember agreement contained an arbitration provision. The essence of her argument is that, because the arbitration agreement was in fine print and was not called to her attention conspicuously, she did not knowingly waive her right to a jury trial as required by Alabama law. *See Mall, Inc. v. Robbins*, 412 So.2d 1197, 1199 (Ala.1982); *Gaylord Dept. Stores of Alabama, Inc. v. Stephens*, 404 So.2d 586, 588 (Ala.1981). The court is not persuaded by this argument.[10]

---

4. Defendant's motion to compel arbitration, etc., filed May 13, 2003, exh. 1, declaration of Susan Hewitt (Hewitt decl. I).

5. Plaintiff's brief in opposition to defendant's motion for order to compel arbitration, etc., filed June 13, 2003 (plaintiff's opposition), p. 7.

6. *Id.*

7. Hewitt decl. I at 2.

8. Defendant's reply brief in support of its motion to compel arbitration, etc., filed July 8, 2003, exh. A, supplemental declaration of Susan Hewitt at 3.

9. Plaintiff's opposition, exh. A, affidavit of Katrina H. Taylor at 1.

10. Because this claim is directed specifically at the arbitration provision in the cardmember agreement, it does not implicate the *Prima Paint* rule. See *supra* at 1309, 1310–11.

■ To the extent that Alabama law requires that an arbitration agreement be conspicuous or disclosed in a particular way, it is preempted by the FAA.[11] *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996); *see also Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) ("What States may not do is decide that a contract is fair enough to enforce all its basic terms ... but not fair enough to enforce its arbitration clause."). In *Doctor's Associates,* the Supreme Court invalidated a Montana law that required that "[n]otice that a contract is subject to arbitration ... shall be typed in underlined capital letters on the first page of the contract." 517 U.S. at 686, 116 S.Ct. at 1655. The Court held that, by enacting the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *Id.* at 687, 116 S.Ct. at 1656 (internal quotation omitted). Thus, this court cannot credit Taylor's argument that Alabama state law required that the arbitration provision in her cardmember agreement be "called to her attention very conspicuously." [12]

In three recent cases, then-Chief Judge Albritton of this court rejected nearly identical arguments to the one raised by Taylor on the ground that they were foreclosed by the Supreme Court's decision in *Doctor's Associates. Taylor v. Citibank USA, N.A.,* 292 F.Supp.2d 1333, 1337 (M.D.Ala.2003) (plaintiff argued that arbitration agreement was on the fourth page of a notice of change of terms); *Billups v. Bankfirst,* 294 F.Supp.2d 1265, 1269 (M.D.Ala.2003) (plaintiff argued that no one from the defendant bank called her attention to arbitration provision in credit card agreement); *Gipson v. Cross Country Bank,* 294 F.Supp.2d 1251, 1255 (M.D.Ala. 2003) (same). The court agrees with Judge Albritton's analysis and concludes that Taylor's argument affords her no relief from the arbitration provision.

### 3. Reasonable Mechanism for Assent

Taylor next argues that she did not assent to the arbitration provision because the cardmember agreement did not provide a reasonable mechanism for her to do so. Taylor objects that her use of her Visa card cannot be understand as her assent to be bound by the terms of the cardmember agreement. Alabama contract law holds otherwise.

■ This contention also appears to implicate the *Prima Paint* rule that arguments that go to the validity of a contract as a whole must be left for the arbitrator to resolve. However, contentions about a lack of assent go to the very existence of

---

In other words, Taylor's argument does not challenge the "validity of the contract as a whole." *Rollins, Inc. v. Foster,* 991 F.Supp. 1426, 1431 (M.D.Ala.1998) (Thompson, C.J.)

**11.** It is not even clear that, under Alabama law, the arbitration provision in Taylor's cardmember agreement would be insufficient. In none of the cases cited by Taylor was the sole determinative issue that the arbitration agreement at issue was in fine print. In addition, in *Mall, Inc. v. Robbins,* 412 So.2d 1197, 1199 (Ala.1982), the Alabama Supreme Court held that a contractual waiver of the right to a

jury trial was enforceable where the text of the contract called attention to the waiver. ("The contractual waiver ..., which is entitled 'Waiver of Trial by Jury: Tenant Not To Counterclaim' ... is not inconspicuously buried deep in the contract."). The provision of Taylor's cardmember agreement embodying the agreement to arbitrate is entitled, in bold font, "Mediation and Arbitration." Agreement ¶ 29. This is not as clear as the language in the contract in *Robbins,* but neither is it wholly inconspicuous.

**12.** Plaintiff's opposition at 14.

an agreement between the parties and are thus within the exception to the *Prima Paint* rule. *Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000 (11th Cir.1986) (per curiam) ("[W]here the allegation is one of ... ineffective assent to the contract, the issue [of arbitrability] is not subject to resolution pursuant to an arbitration clause contained in the contract documents."); *Stinson v. America's Home Place, Inc.*, 108 F.Supp.2d 1278, 1283 (M.D.Ala.2000) (Thompson, J.). Thus, the court, and not the arbitrator, should resolve this claim.

 Under Alabama law there is no requirement that a contract contain a signature to demonstrate assent; the existence of a contract may be inferred from external and objective manifestations of assent.[13] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore*, 751 So.2d 8, 11 (Ala.1999); *Ex Parte Rush*, 730 So.2d 1175, 1177–78 (Ala.1999); *see also* 17A Am. Jur.2d Contracts § 34 ("The purpose of a signature on a contract is to show mutual assent; however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent."). More specifically, a credit card holder's use of her card signals her assent to the terms of the credit card agreement. *See SouthTrust Bank v. Williams*, 775 So.2d 184, 189 (Ala.2000). Thus, it is not unreasonable that the cardmember agreement between Taylor and First North American would provide that

her use of the card amounted to her assent to the terms in the agreement.

Taylor's contention that "[m]ost people would understand the process of contract formation to be consummated by issuance of the card, not begun by that as [First North American] apparently claims"[14] is directly contrary to the accepted rule that credit card agreements are unilateral contracts. *Williams*, 775 So.2d at 188; *Garber v. Harris Trust & Sav. Bank*, 104 Ill.App.3d 675, 60 Ill.Dec. 410, 432 N.E.2d 1309, 1312 (1982); *City Stores Co. v. Henderson*, 116 Ga.App. 114, 156 S.E.2d 818, 823 (1967); *see also* Joseph M. Perillo, *Corbin on Contracts* § 2.33, at 301–02 (rev. ed.1993).

> "When an issuer of a credit card, like MasterCard, Visa or American Express, sends to the holder the card and the form describing the terms for its use, it makes an offer for the formation of a number of contracts by successive acceptances from time to time as the card is used.... The credit card relationship, properly analyzed, should be viewed as an offer by the issuer to create the opportunity for a series of unilateral contracts which are actually formed when the holder uses the credit card to buy goods or services or to obtain cash."

*In re Ward*, 857 F.2d 1082, 1086–87 (6th Cir.1988). Thus, when First North American mailed Taylor her credit card and the cardmember agreement, she was under no obligation to do anything; there was no

---

**13.** First North American argues that, because the cardmember agreement provides that it is to be governed by Georgia law, Taylor's argument should be evaluated against Georgia law. Under Georgia law, Taylor's use of her card would amount to sufficient assent. *See Comvest, L.L.C. v. Corporate Secs. Group, Inc.*, 234 Ga.App. 277, 507 S.E.2d 21, 24–25 (1998) ("A party may be bound by an agreement to arbitrate even in the absence of his signature.... Parties may be bound by the terms of a contract, even though they do not

sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract.") (internal quotations omitted). However, because the court finds that Alabama law similarly provides that Taylor assented to the terms of the cardmember agreement here, there is no need to resolve whether Alabama law or Georgia law governs.

**14.** Plaintiff's opposition at 14.

contract. However, when she used the credit card, she accepted the bank's terms contained in the cardmember agreement, including the arbitration provision.

### 4. Illusory Agreement

██ Taylor next argues that the agreement between First North American and herself is illusory because it includes a provision, paragraph 19, that allows the bank to add provisions to the agreement unilaterally. In other words, Taylor argues that her agreement to arbitrate is not supported by adequate consideration. This argument is unavailing because it contravenes the *Prima Paint* rule.[15]

As stated above, the court "may consider only issues relating to the making and performance of the agreement to arbitrate," and not issues related to the making of the contract generally. *Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806; *John B. Goodman*, 321 F.3d at 1095–96. "*Prima Paint's* mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator." *Rollins, Inc. v. Foster*, 991 F.Supp. 1426, 1431 (M.D.Ala.1998) (Thompson, C.J.).

Taylor's argument challenges the validity of the contract as a whole. Paragraph 19 provides that First North American, after notice as required by "applicable law," may change the cardmember agreement and that the cardmember's failure to subsequently surrender the card will constitute consent to the change.[16] Taylor argues that, because it can modify the agreement unilaterally, the bank's promises in the contract are illusory and that, therefore, the cardmember agreement is unenforceable. In Taylor's own words, she argues that "[t]he [First North Ameri-

can] Card Agreement is no agreement at all."[17] This argument implicates the entire cardmember agreement and not just the arbitration provision, however, because paragraph 19 allows the bank to modify any provision in the agreement. The effect of Taylor's argument would be to render all of Taylor's obligations in the contract unenforceable. Accordingly, under *Prima Paint*, this argument is properly for an arbitrator to decide and not this court.

Taylor's claim is not within the exception to the *Prima Paint* rule outlined above because it does not go to her assent to the cardmember agreement as a whole. *Cf. Cancanon*, 805 F.2d at 1000 (allegations of ineffective assent to contract containing arbitration clause are to be resolved by the court); *Stinson*, 108 F.Supp.2d at 1283 ("The common feature of most, if not all, [cases that fall within the exception] is a viable claim of lack of assent to the contract, and by extension, the arbitration clause it contains."). Taylor's claim here is not that she did not agree to the terms of the cardmember agreement, but rather that she should not be held to the terms of that agreement because of the illusory nature of the bank's promises.

The cases relied on by Taylor do not persuade this court otherwise. It is true that the cases cited by Taylor, all of which arose in the employment context, stand for the general proposition that a promise to arbitrate that is not supported by consideration is not enforceable. *See, e.g., Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315–16 (6th Cir.2000); *Hooters of America, Inc. v. Phillips*, 173 F.3d 933,

---

**15.** The argument is also unavailing because Alabama law explicitly allows credit card companies to amend cardmember agreements in exactly the manner provided for in paragraph 19. 1975 Ala.Code § 5–20–5; *see also*

*SouthTrust Bank v. Williams*, 775 So.2d 184, 190 (Ala.2000).

**16.** Agreement at ¶ 19.

**17.** Plaintiff's opposition at 20.

938 (4th Cir.1999); *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1131 (7th Cir.1997). However, in these cases, the courts were not faced with the *Prima Paint* question of whether the employee's claim of inadequate consideration challenged the validity of an arbitration clause or challenged the validity of an employment contract as a whole.

In *Floss,* the plaintiff employee was challenging a stand-alone arbitration agreement she was required, as a condition of her employment, to enter into with a third-party arbitration service. *See* 211 F.3d at 309–10. The arbitration agreement gave the arbitration service "the unlimited right to modify the rules without the employee's consent." *Id.* at 310. However, because the arbitration agreement was separate from the plaintiff's employment contract, the *Prima Paint* issue did not arise.

In *Hooters* and *Gibson,* the plaintiff employees challenged arbitration clauses contained in their employment contracts. The plaintiffs argued that the employers' purportedly reciprocal promises to arbitrate disputes were, in fact, illusory either because the employer had the right to unilaterally change the terms of the arbitration clause, *see Hooters,* 173 F.3d at 940 (The arbitration "rules provide that upon 30 days notice Hooters, but not the employee, may cancel the agreement to arbitrate. Moreover, Hooters reserves the right to modify the rules … whenever it wishes and without notice to the employee."), or because the employer was not bound by the arbitration agreement at all, *Gibson,*

121 F.3d at 1131 ("The [contract] contains no promise on [defendant's] part to submit claims to arbitration. It is worded entirely in terms of Gibson's obligation to submit her claims to arbitration …; it contains no promise on [defendant's] part."). The *Prima Paint* question simply did not come up in *Hooters* and *Gibson* because only the arbitration clauses, not the contracts as a whole, were subject to unilateral modification. Thus, the courts could proceed to consider the contract-law question of whether a promise to arbitrate, unsupported by a reciprocal promise, should be enforced.

Only one decision cited by Taylor, *Dumais v. American Golf Corp.,* 299 F.3d 1216 (10th Cir.2002), arguably involved the issue presented here. Dumais signed an employment contract with American Golf Corporation that contained both an arbitration clause and a clause the court interpreted as permitting American Golf to make unilateral changes to the terms of the employment contract. 299 F.3d at 1218. This court is not persuaded by *Dumais,* however, because it does not address the *Prima Paint* rule, that is, it did not consider whether the change-in-terms clause would render the rest of the contract unenforceable as well. More to the point, the court did not explain how the plaintiff's argument might constitute an exception to the *Prima Paint* rule.[18]

The three opinions from 2003 by then-Chief Judge Albritton, cited above, further convince this court that this issue is one for the arbitrator to resolve. Judge Al-

---

18. In any event, the change-in-terms provision in Taylor's cardmember agreement—paragraph 19—is not as suspect as the clause at issue in *Dumais.* The provision in *Dumais* provided that the employer had "the right to at any time change, delete, modify, or add to any of the provisions contained" in the contract." 299 F.3d at 1217. Paragraph 19, in contrast, requires the bank to notify Taylor before changing the terms of her cardmember agreement and provides that "Failure to surrender your Account Card prior to the effective date of the change will constitute your consent to the change in terms she can avoid any new terms by cancelling her card." In other words, Taylor must assent to any change.

britton rejected the same argument that Taylor raises here, holding that he was foreclosed by *Prima Paint* from considering whether change-of-terms provisions in credit card agreements rendered those agreements illusory. *Taylor,* 292 F.Supp.2d at 1338–40; *Billups,* 294 F.Supp.2d at 1270–71; *Gipson,* 294 F.Supp.2d at 1256–57.

### 5. Motion for Jury Trial

■ Taylor separately filed a motion for a jury trial on the question of whether an agreement to arbitrate existed between her and First North American.[19] The FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the party alleged to be in default may . . . demand a jury trial of such issue." 9 U.S.C.A. § 4. To warrant a jury trial, the party seeking to avoid arbitration must "unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial." *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 818 (11th Cir.1993) (internal quotation omitted). The party challenging the arbitration provision must create a genuine issue of fact by presenting "enough evidence to make the denial colorable." *Chastain,* 957 F.2d at 854.

Taylor's motion for a jury trial is due to be denied because she has not created a genuine issue of fact. As discussed above, there is no question that Taylor received the cardmember agreement and assented to its terms. Furthermore, the court is precluded by *Doctor's Associates* from holding that the cardmember agreement did not sufficiently disclose the presence of the arbitration clause and precluded by *Prima Paint* from taking up the question of the supposed illusory nature of the

bank's promises in the cardmember agreement. Because nothing is left to present to a jury, Taylor's motion for a jury trial will be denied.

### B. Vindication of Statutory Rights

Taylor's second argument in opposition to First North American's motion to compel arbitration is that the costs associated with arbitrating her claim in accordance with the arbitration provision in her cardmember agreement will effectively prevent her from vindicating her rights under TILA and the FCBA. Thus, Taylor argues, the arbitration provision is unenforceable.[20]

■ "[F]ederal statutory claims can be appropriately resolved through arbitration, and [the Supreme Court has] enforced agreements to arbitrate such claims." *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 89, 121 S.Ct. 513, 521, 148 L.Ed.2d 373 (2000). However, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; [the party] only submits to their resolution in an arbitral, rather than a judicial forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). An agreement to arbitrate a statutory claim should be enforced "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. . . . If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict between arbitration and the [statute's] underlying purposes." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991). When a "prospective

---

**19.** Motion for jury trial, etc., filed on June 13, 2003 (doc. no. 10).

**20.** This argument is one that the court may properly resolve under *Prima Paint* because it

is directed at the arbitration provision itself and not at the cardmember agreement generally.

litigant effectively may vindicate his or her statutory cause of action in the arbitral forum," there is no "inherent conflict" between arbitration and the underlying statute. *Id.* at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359).

Taylor's argument is that the filing and hearing fees required by the National Arbitration Forum (NAF), the forum specified in the parties' arbitration clause, effectively prevent her from bringing a class action. It appears that if Taylor brought a class action to arbitration before the NAF, she would be subject to its "large claim" filing fee of, at the least, $750.00.[21] Further, she would be subject to hearing fees that start at $2,500.00.[22] Taylor claims that she is not be able to pay these fees, and, therefore, there is an inherent conflict between arbitration and the purpose of TILA and the FCBA.[23]

■■■■ The unspoken assumption of Taylor's argument is that TILA or the FCBA provides her a right to bring a class-action lawsuit or that the underlying purpose of the statutes cannot be advanced without class-action litigation. TILA provides that a plaintiff bringing a civil action to enforce the FCBA may recover (1) "any actual damages sustained," 15 U.S.C.A. § 1640(a)(1); (2) statutory damages set at "twice the amount of any finance charged in connection with the transaction" in individual actions and "such amount as the court may allow" in class actions subject to a limit of "the lesser of $500,000 or 1 per centum of the net worth of the creditor," § 1640(a)(2)(A)-(B); and (3) "the costs of the action, together with a reasonable attorney's fee as determined by the court," § 1640(a)(3). The statute thus does not explicitly provide that plaintiffs may bring class-action lawsuits, but it clearly contemplates class-action suits.

While TILA clearly allows class-action recovery, Taylor's argument that she has a right to bring a class-action lawsuit is foreclosed by the Eleventh Circuit's decision in *Randolph v. Green Tree Fin. Corp.-Alabama,* 244 F.3d 814, 816 (11th Cir.2001), in which the court considered "whether an arbitration agreement that bars pursuit of classwide relief for TILA violations is unenforceable for that reason." The court began by acknowledging that "the text of TILA specifically contemplates class actions" and that TILA's legislative history "stresses the importance of class action procedures in the TILA scheme." 244 F.3d at 817 (quoting *Bowen v. First Family Fin. Servs., Inc.,* 233 F.3d 1331, 1337 (11th Cir.2000)). However, the court continued, "there exists a difference between the availability of the class action tool, and possessing a blanket right to that tool under any circumstance. An intent to create such a 'blanket right,' a non-waivable right, to litigate by class action cannot be gleaned from the text and the legislative history of the TILA." *Id.* (quoting *Bowen,*

---

**21.** *See* Defendant's reply brief, etc., filed July 8, 2003, exh. C, National Arbitration Forum rules of procedure, app. C.

**22.** *Id.*

**23.** Taylor's argument is predicated on her inability to pay NAF's fees. Taylor writes that "[First North American's] arbitration provision ... effectively prevents her from vindicating her claims here on a class basis, even though the agreement does not expressly preclude a class-wide arbitration." Plaintiff's opposition at 22. The bank, however, points out that "Rule 19(a) of the NAF's Code of Procedure *prohibits* classwide arbitrations absent consent of all parties" and that "[b]ecause [it] does not consent to classwide arbitration, [Taylor's] arguments regarding the alleged costs associated with such an arbitration are irrelevant." Defendant's surreply, etc., filed August 18, 2003, p. 2. It thus appears that even if there were no filing or hearing fees, the arbitration agreement in this case would bar a class-action arbitration.

233 F.3d at 1337–38). The court concluded that "Congress [did not intend] to preclude the arbitration of TILA claims, even where arbitration would prevent the claims from being brought in the form of a class action." *Id.* at 818. The United States Court of Appeals for the Third Circuit has reached the same conclusion. *Johnson v. West Suburban Bank,* 225 F.3d 366, 369 (3d Cir.2000).

Thus, "a contractual provision to arbitrate TILA claims is enforceable even it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA." *Randolph,* 244 F.3d at 819. Therefore, even if Taylor is correct that the filing and hearing fees required by the NAF would prevent her from bringing a class-action claim in arbitration, and even if the NAF rules explicitly proscribe class-action arbitration, the court must still compel arbitration pursuant to the agreement between Taylor and First North American. *See Billups v. Bankfirst,* 294 F.Supp.2d 1265, 1272–1273 (M.D.Ala.2003) (Albritton, J.).

Taylor tries to distinguish the Eleventh Circuit's decision in *Randolph* on the ground that it did not involve the claim that high fees would prevent arbitration on a classwide basis. Why this factual distinction makes a difference is not apparent, however. If an arbitration agreement that flatly prohibits classwide arbitration of claims arising under TILA is enforceable, surely an arbitration provision that may have the effect of preventing classwide arbitration is enforceable.

Taylor makes a related argument that if she cannot bring a class-action suit, the costs associated with bringing an individu-al suit will prevent her from vindicating her statutory rights.[24] Taylor's argument seems to be that, even if she can recover her attorneys' fees and costs in arbitration, she will not be able to proceed individually because she will have to advance her legal fees as the case progresses, something she cannot afford.[25] Taylor also seems to be arguing that no attorney will take her individual claim at all because the amount of damages involved is so small.[26]

"[T]he existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000); *Musnick v. King Motor Company,* 325 F.3d 1255, 1260 (11th Cir.2003); *Bess v. Check Express,* 294 F.3d 1298, 1303–04 (11th Cir.2002). Taylor's argument is unavailing, however, because it is not directed at the costs associated with arbitration. Rather, the gist of her argument is that it does not make economic sense to bring individual TILA claims. This may be true as a matter of fact, but it is an argument that applies to claims litigated in federal court as much as to claims litigated before an arbitrator. Furthermore, to the extent that Taylor's argument is that the bad economics of individual lawsuits means that she should have a right to bring a class action as the only way to enforce her rights under TILA and the FCBA, that argument is exactly the one rejected by the court in *Randolph.*

In conclusion, under clear Eleventh Circuit precedent, the fact that the arbitration provision in her Taylor's cardmember agreement with First North American will

24. Plaintiff's opposition at 21–22.

25. *Id.* at 21.

26. *Id.,* exh. C, affidavit of Terry G. Davis, p. 5 ("No competent lawyer would undertake this case on a contingent fee basis if the only possible recovery is the small dollar value of the individual claim at issue and possible reimbursement of attorney's fees and expenses if successful.").

prevent her from bringing a class-action lawsuit is not a reason to find the arbitration provision unenforceable.

### C. Unconscionability

Taylor's last argument is that the arbitration provision in her cardmember agreement is unconscionable under generally applicable Alabama contract law because it effectively precludes her from bringing an action to enforce her rights.[27] This argument rests on the same factual premises as the above argument: the costs of bringing Taylor's individual claim in arbitration are greater than the amount she is likely to recover, and she cannot afford the costs of bringing a class action in arbitration. Taylor concludes that, for these reasons, the arbitration agreement is unconscionable.

■ Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996). "Because Alabama law allows unconscionability to invalidate contracts generally, this defense may also invalidate the arbitration agreement in his case if [Taylor] proves unconscionability by substantial evidence." *Bess v. Check Express*, 294 F.3d 1298, 1307 (11th Cir.2002).

■ Traditionally, Alabama courts have applied four factors to decide if a contract is unconscionable: "(1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided or patently unfair terms in the contract." *Layne v. Garner*, 612 So.2d 404, 408 (Ala.1992). "For ease of discussion," the Alabama Supreme Court "reduce[d] the *Layne v. Garner* test further to one comprised of two essential elements: (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." *American Gen'l Fin., Inc. v. Branch*, 793 So.2d 738, 748 (Ala. 2000). As this court has previously observed, "at a minimum, a party cannot rely on an abstract principle or theory of unfairness of a bargain to make a case for unconscionability; it must still be gauged by the actual circumstances of the case, and not in the abstract." *Roberson v. Money Tree of Alabama, Inc.*, 954 F.Supp. 1519, 1525 (M.D.Ala.1997) (Thompson, J.).

■ Taylor's unconscionability argument rests on *Leonard v. Terminix Int'l Co.*, 854 So.2d 529 (Ala.2002). In *Leonard*, the Alabama Supreme Court held that an arbitration provision was unconscionable because it restricted the plaintiffs to a forum where the expense of pursuing their claim exceeded the amount in controversy. While the facts of *Leonard* are, in some ways, similar to those in this case, *Leonard* is distinguishable.

In 1994, Walter and Evaline Leonard purchased a home from a seller who had a termite bond with Terminix. 854 So.2d at 530. Terminix subsequently sent the Leonards a "Termite Protection Plan" that provided that Terminix would inspect the home for termites on an annual basis. *Id.*

---

**27.** As noted previously, the cardmember agreement between Taylor and First North American has a clause providing that Georgia law governs its interpretation. *See* Agreement at ¶ 17. However, the bank does not argue that Georgia's law of unconscionability should apply here.

The Leonards paid the annual renewal fees on the plan for three years. *Id.* at 532. After Terminix failed to comply with an Alabama statute that requires it to make annual inspections, the plaintiffs brought an action against Terminix seeking, among other relief, rescission of the contract and restitution. *Id.* at 532. The trial court granted Terminix's motion to compel arbitration.

The agreement between the Leonards and Terminix contained two relevant provisions. First, it contained an arbitration clause that provided that "any controversy or claim . . . shall be settled exclusively by arbitration . . . [,] conducted in accordance with the Commercial Arbitration rules then in force of the American Arbitration Association." 854 So.2d at 531. Second, the agreement, both in the arbitration provision and in a separate clause, provided that the plaintiff could not recover "special, incidental, or consequential damages." *Id.* at 531–32.

On appeal, the plaintiffs argued that the arbitration clause was unconscionable because the costs of litigating their individual claim before the arbitrator would be more than the amount in controversy and because the arbitration provision prevented them from bringing an economically feasible class action.[28] The plaintiffs' suit was for less than $500, and they claimed that under the rules provided for in their arbitration agreement they would be responsible for: "(1) a $500 arbitration filing fee; (2) a minimum $150 administrative fee per party; (3) an administrative fee of $150–$250 per day per party for each hearing date; (4) one-half of the average arbitrator's fee of $700 per day; (5) one-half the

cost of the charge for a meeting room; and (6) the cost of an attorney." 854 So.2d at 535.

The court held that the arbitration agreement was unconscionable and unenforceable because of "[t]he limitation upon recovery of 'indirect, special, and consequential damages or loss of anticipated profits' in the arbitration clause and elsewhere in the agreement" and because of "the preclusion of eligibility for class-action treatment by inserting a provision requiring arbitration." *Id.* The court held that these two provisions "deprive[d] the Leonards of a meaningful remedy" and concluded that "Terminix has extracted unreasonably favorable and patently unfair terms in its contract of adhesion." *Id.*

The court also noted that the contract between the Leonards and Terminix was a "contract of adhesion," that the Leonards "were not given any opportunity to accept or reject the arbitration provision," that they were not "given any *quid pro quo* for agreeing to arbitration," and that the "Leonards are not sophisticated or wealthy consumers with equal bargaining power." 854 So.2d at 538. The court also noted that upon buying their house, "[t]he Leonards' choice was to accept the transfer of the [sellers'] contractual relationship with Terminix (with no added cost) or obtain the termite bond from another termite control company, which would have required payment of substantial added costs of at least $1,000 for a new termite treatment by that company." *Id.*

In some ways, this case is very similar to *Leonard.* Taylor was not given an opportunity to accept or reject the arbi-

---

**28.** It is not clear from the *Leonard* opinion why the Leonards were prohibited from bringing a class-action claim to arbitration. It may be that an explicit term of their arbitration provision prevented them from doing so. On the other hand, under Alabama law, classwide arbitration is permitted only when the arbitration agreement provides for it, *Med Center Cars, Inc. v. Smith,* 727 So.2d 9, 20 (Ala.1998); thus, it may be that the Leonards' arbitration agreement was silent on the question of class arbitration.

tration provision; she did not have an opportunity to bargain for additional consideration for waiving the opportunity to go before a jury; and she is not a wealthy consumer with bargaining power equal to the First North American's. Moreover, the court is willing to assume that, like the Leonards, Taylor will not be able to proceed in arbitration on a classwide basis.

The present case is distinguishable from *Leonard,* however. First, unlike in *Leonard,* the arbitration agreement between Taylor and First North American does not limit Taylor's right to recover damages. The arbitration clause provides that arbitration will proceed according to the rules of procedure of NAF, and those rules provide that Taylor can recover any damages available under the applicable substantive law. NAF Rule of Procedure 20.C ("An Arbitrator shall follow the applicable substantive law and may grant any remedy or relief provided by law in deciding a Claim."). Thus, Taylor can recover the damages provided for under TILA. 15 U.S.C.A. § 1640(a)(1)-(2). It is likely that the amount Taylor will recover if she prevails on her individual claim will be modest; however, her recovery will be no less than what she would recover absent the arbitration provision.

Second, the fees called for in NAF's Rules of Procedure are lower than those facing the plaintiffs in *Leonard.* Indeed, Justice Ginsurg has cited NAF as an example of a forum providing for "fair cost and fee allocation." *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 95 n. 2, 121 S.Ct. 513, 524 n. 2, 148 L.Ed.2d 373 (2000) (concurring in part and dissenting in part). In this case, Taylor would be responsible for a $25 filing fee, and First North American would be responsible for

the $25 commencement fee and the $200 administrative fee.[29] If Taylor requests a participatory hearing, she would pay half the $150 participatory hearing session fee.[30] These are only the basic fees; they do not include the arbitrator's fees or additional costs (for written findings of fact, for example). Overall, however, the costs provided for by NAF are lower than those facing the Leonards.

Third, if Taylor is successful in her individual claim, she will recover her costs and her attorneys fees. The court in *Leonard* assumed that the plaintiffs would be required to pay the costs of arbitration. *See Leonard,* 854 So.2d at 540–41 (See, J.) (dissenting). In this case, TILA provides that "in the case of any successful action to enforce ... liability," the plaintiff shall recover "the costs of the action, together with a reasonable attorney's fee," 15 U.S.C.A. § 1640(a)(3), and NAF's rules of procedure provide that "[a]n Award may include fees and costs awarded by an Arbitrator ... as permitted by law," NAF Rule of Procedure 37.C. Thus, with respect to recovering fees and costs, Taylor is in no worse a situation than she would be in if she brought her individual claim to court.

For these reasons, the court concludes that the terms of the arbitration agreement between Taylor and First North American are not "grossly favorable" to the bank. *American Gen'l Fin.,* 793 So.2d at 748. "A court must be wary of finding a contract unconscionable where the plaintiff is left with some place to go because denial of a specific remedy or forum is substantively different from denial of any means of enforcement whatsoever." *Roberson,* 954 F.Supp. at 1526 (internal quotation and citation omitted). If Taylor takes her claim to arbitration, she will be able to

---

**29.** Defendant's reply brief, etc., filed July 8, 2003, exh. C, National Arbitration Forum rules of procedure, app. C.

**30.** *Id.*

recover all damages, costs, and attorneys' fees that she would be entitled to otherwise.

Taylor also has failed to show that First North American had "overwhelming bargaining power." *American Gen'l Fin.*, 793 So.2d at 748. It is undoubtedly true that First North American has greater resources than does Taylor and that the bank would be unlikely to bend to Taylor's demands in negotiation. However, in discussing the "overwhelming bargaining power" element of its test for unconscionability, the Alabama Supreme Court framed the inquiry as "whether the consumer has the ability to obtain the product made the basis of the action without signing an arbitration clause." *Id.* at 750 (internal quotation omitted). The court would not be surprised if most credit card agreements were subject to arbitration provisions, but Taylor has made no showing on this issue.

In sum, Taylor has not established that the arbitration agreement between herself and First North American is unconscionable under Alabama law.

An appropriate judgment will be entered granting First North American's motion to stay proceedings and compel arbitration and denying Taylor's motion for jury trial.

### JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The motion for order to compel arbitration and to stay proceedings, filed by defendant First North American National Bank on May 13, 2003 (doc. no. 8), is granted.

(2) Plaintiff Katrina H. Taylor is ENJOINED and RESTRAINED from failing to arbitrate forthwith her claims against defendant First North American National Bank.

(3) The motion for jury trial on the issue of arbitrability, filed by plaintiff Taylor on June 13, 2003 (doc. no. 10), is denied.

(4) The proceedings in this case are stayed pending arbitration.

The clerk of the court is DIRECTED to close this case administratively.