Reather LAWRENCE, Kari Brown and Abe Hunter III, Plaintiffs,

v.

HOUSEHOLD BANK (SB), N.A. and Household Credit Services, Inc., Defendants.

Civil Action No. 2:03cv280–T.

United States District Court, M.D. Alabama, Northern Division.

Sept. 13, 2004.

George C. Douglas Jr., Burmingham, AL, James N. Walter, Jr., Wyndall A. Ivey, Capell Howard PC, Montgomery, AL, Jerry L. Thornton, Law Office of Jerry L. Thornton, Hayneville, AL, for Plaintiffs.

Andrew J. Noble, III, Ronald H. Kent, Jr., Bradley, Arant, Rose & White LLP, Birmingham, AL, Christopher R. Lipsett, Matthew Phineas Previn, Wilmer, Cutler, Pickering, Hale & Dorr LLP, New York City, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiffs Reather Lawrence, Kari Brown, and Abe Hunter III brought this lawsuit against defendants Household Bank (SB), N.A., and Household Credit Services, Inc. in an Alabama state court, claiming violations of the federal Fair Credit Billing Act (FCBA), 15 U.S.C.A. §§ 1666–1666j, as enforced by the Truth in Lending Act (TILA), 15 U.S.C.A. § 1640. Defendants removed this lawsuit from state to federal court pursuant to 28 U.S.C.A. §§ 1441 and 1446; this court's jurisdiction is properly invoked under 28 U.S.C.A. § 1331.

Defendants filed a motion to stay the proceedings pending arbitration under the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1–16. In turn, plaintiffs Brown and Hunter filed a motion seeking a jury trial on the question of whether there exist agreements to arbitrate in this case. For the reasons discussed below, the court will grant defendants' motion in part and deny it in part and will deny plaintiffs Brown and Hunter's motion.

## I. BACKGROUND

### A. Plaintiffs' Accounts

At the heart of this matter are the various credit card accounts held by plaintiffs.

*Reather Lawrence's Account.* Lawrence has a UnionPlus credit card issued by defendants. Lawrence's cardmember agreement does not contain an arbitration agreement.

*Abe Hunter's Account.* Hunter opened a credit card account with Sears National Bank in October 2001. The account was governed by a cardholder agreement that contained the following broad change-of-terms provision: "As permitted by applicable law, the Bank has the right to change any term or part of this Agreement, including the Annual Percentage Rate applicable to outstanding and future balances. The Bank will send me a written notice of any such changes when required by applicable law." [1] Hunter's account was assigned to Household Bank (Nevada), N.A. in November 2001.

In March 2002, Hunter was sent a notice that his account had been transferred to Household Bank (Nevada), N.A. and that the terms of his account were being changed. The notice was entitled "Important Changes To Your Sears National Bank Sears Home Improvement Account Cardholder Account And Security Agreement." [2] The change-of-terms notice pro-

---

[1]. Mo. to Stay Proceedings, etc., filed on May 23, 2003, Aff. of Cynthia A. Lewis (Lewis Aff.), Ex. A, Sears Home Improvement Account Cardholder Account and Security Agreement, § 22.

[2]. *Id.,* Ex. B.

vided that the account would be "governed by, and interpreted under, federal law ... and the laws of the State of Nevada" effective February 16, 2002.[3]

The March 2002 notice also included an entirely new cardholder agreement that included an arbitration provision. The arbitration provision stated in relevant part:

"Any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future) ... arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement ('Claim') shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed.

"... On any Claim you file, you will pay the first $50 of the filing fee. At your request we will pay the remainder of the filing fee and any administrative or hearing fees charged by the arbitration administrator on any Claim submitted by you in arbitration up to a maximum of $1,500. If you are required to pay any additional fees to the arbitration administrator, we will consider a request by you to pay all or part of the additional fees; however, we shall not be obligated to pay any additional fees unless the arbitrator grants you an award. If the arbitrator grants an award in your favor, we will reimburse you for any additional fees paid or owed by you to the arbitration administrator up to the amount of the fees that would have been charged if the original Claim has been for the amount of the actual award in your favor. The parties shall bear the expense of their respective attorney's fees, except as otherwise provided by law. If a statute gives you the right to recover any of these fees, or the fees paid to the arbitration administrator, these statutory rights shall apply in the arbitration notwithstanding anything to the contrary contained herein. If the arbitrator issues an award in our favor you will not be required to reimburse us for any fees we have previously paid to the arbitration administrator or for which we are responsible.

. . . .

"... No class actions or joinder or consolidation of any Claim with the claim of any other person are permitted in arbitration without the written consent of you and us.

"THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE OR JURY, BUT WILL NOT HAVE THAT RIGHT IF EITHER PARTY ELECTS ARBITRATION. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY EITHER PARTY."[4]

The notice provided that the new cardholder agreement and its terms would become effective on April 17, 2002. A payment was received from Hunter on April 3, 2002.

Household Bank (Nevada), N.A. merged with Household Bank (SB), N.A. in July 2002, and Hunter's account became an account of Household Bank (SB), N.A.

---

**3.** *Id.* at 1.

**4.** *Id.* at ¶ 15.

*Kari Brown's Account.* Brown opened a GM Card credit card account with Household Bank (SB), N.A. in 1993. At the time she opened her account, she was issued a cardmember agreement, and, between ·1993 and 1999, Household Bank mailed Brown amendments to that agreement. The cardmember agreement in effect in June 2000 contained a change-of-terms provision that provided: "SUBJECT TO APPLICABLE LAW, WE MAY CHANGE OR TERMINATE ANY TERM OF THIS AGREEMENT, OR ADD NEW TERMS AT ANY TIME.... PRIOR WRITTEN NOTICE WILL BE PROVIDED TO YOU WHEN REQUIRED BY APPLICABLE LAW." [5] The agreement also provided that it will be governed by federal and Nevada law.

On June 26, 2000, a change-of-terms notice was mailed to Brown at the address in her account records. The notice added to Brown's cardmember agreement an arbitration provision substantially the same as the one above.[6] The notice stated that the amendments would become effective on September 10, 2000. Brown continued to use her card after that date.

## B. This Litigation

Plaintiffs originally filed this lawsuit— individually and on behalf of all other similarly situated holders of personal credit cards issued by defendants—in the Circuit Court for Lowndes County, Alabama in February 2003. Plaintiffs claim that defendants are violating the FCBA, 15 U.S.C.A. § 1666c, and the regulations promulgated to enforce the statute, 12 C.F.R.

§ 226.10, by not posting payments received after 9:00 a.m. to a customer's account until the following day for GM cards and by not posting payments received after 1:00 p.m. until the following day for other cards.

In March 2003, defendants removed this lawsuit to federal court under 28 U.S.C.A. §§ 1441 and 1446, and filed a motion pursuant to the FAA, 9 U.S.C.A. § 1–16, to stay these proceedings in favor of arbitration. Plaintiffs responded with a motion for a jury trial on the question of whether an arbitration agreement exists between themselves and defendants.

## C. *Shea* Litigation

On October 19, 2000, James Shea and four other named plaintiffs, on behalf of themselves and others similarly situated, filed a lawsuit in the Superior Court of Orange County, California, asserting, among other claims, that defendants' practice of not crediting payments to their cardholders' accounts on the day the payments are received violates California common law.[7] The second amended complaint in *Shea*, filed on September 27, 2002, does not include any federal-law claims.

The parties have reached a proposed class settlement in *Shea*. The class is defined as all persons who currently have, or have had at any time between October 20, 1994, and March 18, 2004, one or more credit card issued by defendants and who, during that time period, incurred finance charges, late fees for payments credited on the business day immediately following the payment due date, or overlimit fees.[8] Un-

---

5. Mo. to Stay Proceedings, etc., filed on May 23, 2003, Aff. of Stephanie Jimenez (Jimenez Aff.), Ex. A, The GM Card and The GM Gold Card Cardmember Agreement and Disclosure Statement, p. 2.

6. *Id.,* Ex. B.

7. *See* Pls' Suppl. Opp. to Arbitration, filed June 3, 2004 (Suppl.Opp.), Ex. D, Second Am. Compl., filed Sept. 27, 2002, in *Shea v. Household Bank,* Case No. 00CC12585, Cal.Super. Ct., Orange County.

8. Suppl. Opp., Ex. B, Excerpts of Settlement Agreement, at 7–8.

der the settlement agreement, class members would release defendants from any claims arising out of the acts that formed the basis of the lawsuit, including any claims arising under federal law.[9] The agreement contains a provision that allows would-be class members to opt out of the settlement class.[10] The settlement in *Shea* is set for a final fairness hearing on November 1, 2004.[11]

## II. THE FAA

The FAA makes enforceable a written arbitration provision in a "contract evidencing a transaction involving commerce." 9 U.S.C.A. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). The legislative history makes clear that the FAA's purpose was to overcome long-standing judicial hostility to arbitration agreements and to enforce such agreements. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 n. 14, 105 S.Ct. 3346, 3353 n. 14, 87 L.Ed.2d 444 (1985); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

The FAA provides that, if a lawsuit in federal court has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C.A. § 3.

The FAA also provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another party to arbitrate under a written agreement for arbitration may petition [the court] ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C.A. § 4. Section 4 goes on to provide that, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*

 As a general matter of federal policy, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 651, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (reviewing dispute arising under the Labor Management Relations Act) (internal quotation omitted); *see also Ruby–Collins, Inc. v. City of Huntsville, Alabama*, 748 F.2d 573, 576 (11th Cir.1984) ("[F]ederal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration.").

Despite this presumption favoring arbitration, the FAA prohibits the enforcement of an arbitration clause that is invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. Section 2 "gives States [ ]

---

**9.** *Id.* at 23.

**10.** *See* Suppl. Opp., Ex. A, Class Action Settlement Notice in *Shea v. Household Bank*, at 5–6.

**11.** *Id.* at 6.

method[s] for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision." *Allied–Bruce Terminix v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995).

While federal policy favors arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Accordingly, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (quoting *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)). Issues to be decided by the court "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 451–53, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003).

As a general rule, when considering these "gateway issues," the court "may consider only issues relating to the making and performance of the agreement to arbitrate," and not issues relating to the making of the contract generally. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *John B. Goodman Limited Partnership v. THF Construction, Inc.,* 321 F.3d 1094, 1095–96 (11th Cir.2003) (per curiam). "*Prima Paint's* mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator." *Rollins, Inc. v. Foster,* 991 F.Supp. 1426, 1431 (M.D.Ala.1998) (Thompson, C.J.).

There is an exception to the *Prima Paint* rule, however, for "cases where not merely the enforceability, but the initial formation or existence of a contract, including a disputed arbitration clause, is legitimately called into question, and must be decided by the court." *Rainbow Investments, Inc. v. Super 8 Motels, Inc.,* 973 F.Supp. 1387, 1390 (M.D.Ala.1997) (Thompson, C.J.). Cases in which there is no signed contract and in which one party denies the existence of an agreement fall into this category. The Eleventh Circuit has explained:

"Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. Because the making of the arbitration agreement itself is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests.

"The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of any agreement, including the existence of an agreement to arbitrate. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to

the Act. If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitration at all. Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language."

*Chastain v. The Robinson–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir.1992) (citations and footnotes omitted).

In resolving these "gateway issues," the court applies ordinary state common law governing the formation of contracts. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 n. 9, 115 S.Ct. 1212, 1219 n. 9, 131 L.Ed.2d 76 (1995).

### III. DISCUSSION

There is no dispute in this matter about whether plaintiffs' claims are covered by the purported arbitration agreements contained in Brown and Hunter's cardmember agreements. Rather, the dispute is about the existence of arbitration agreements in the first place and whether the agreements can be enforced.

Defendants argue that the cardmember agreements between themselves and Brown and Hunter include broad, written agreements to arbitrate. Therefore, they argue, the court is required to stay this litigation. 9 U.S.C.A. § 3. Defendants acknowledge that there is no arbitration provision contained in their cardmember agreement with Lawrence but argue that the entire case should be stayed because common questions of fact will be involved in Lawrence's claims and Brown's and Hunter's claims.

Plaintiffs' original opposition brief contains three arguments in response. First, they argue that no agreements to arbitrate exist. Second, they argue that even if arbitration agreements exist, federal law provides that they cannot be enforced because their provisions will prevent them from vindicating their statutory rights. Third, they argue that the arbitration agreements cannot be enforced because their terms are unconscionable under Alabama law.

Plaintiffs in this case and the plaintiff in *Taylor v. First North American Bank*, 325 F.Supp.2d 1304 (M.D.Ala.2004) (Thompson, J.), are represented by the same attorneys, and plaintiffs' arguments in this matter—from their complaint to their opposition to defendants' motion to stay—are close to identical to those raised by Taylor. The court will thus frequently rely on its analysis in *Taylor* in this opinion.

There are a couple of differences between this matter and *Taylor*, however. First, unlike the arbitration agreement in *Taylor*, the agreements at issue in this case contain explicit language barring cardholders from bringing class claims to arbitration. This changes the nature of plaintiffs' claim that the arbitration agreement prevents them from vindicating statutory rights. However, it does not change the court's conclusion. The court addresses this issue in subsection B. Second, plaintiffs here argue that because defendants have agreed to a settlement in the *Shea* litigation, defendants have waived their right to compel arbitration and are judicially estopped from arguing that the case must go to arbitration. This argument was not raised in *Taylor*; the court will discuss it in subsection D. Finally, unlike *Taylor*, this case involves multiple plaintiffs, one of whom does not have an arbitration agreement with defendants. The

court will address this issue in subsection E.

## A. Existence of an Arbitration Agreement

Plaintiffs make four arguments to the effect that no agreement to arbitrate exists between themselves and defendants. Plaintiffs argue that (1) there is no evidence that the cardmember agreements were mailed or delivered to them; (2) they were not given meaningful notice that their cardmember agreements contained arbitration provisions; (3) the cardmember agreements did not provide a reasonable mechanism for their assent; and (4) defendants' right to change the cardmember agreements unilaterally makes the agreements unenforceable. Related to these issues is plaintiffs' motion for a jury trial on the issue of whether agreements to arbitrate were made.

### 1. Delivery of the Cardmember Agreement

■ Plaintiffs argue that defendants have not established that the original cardmember agreements at issue in this case or the amendments thereto were mailed or delivered to them and that, therefore, no arbitration agreements exist. Because this issue goes to plaintiffs' assent to the cardmember agreement, the court, and not the arbitrator, is the proper party to resolve this dispute. *Taylor*, 325 F.Supp.2d at 1310. As in *Taylor*, the court is persuaded that the totality of the evidence establishes that plaintiffs received the relevant cardmember agreements and change-of-terms notices. *Id.* at 1311.

■ With respect to Hunter, the two affidavits submitted by Cynthia Lewis, an employee of defendants, establish that it was defendants' standard practice to distribute cardmember agreements to new cardholders and that the change-of-terms notice was mailed to Hunter in March 2002.[12] The law recognizes a rebuttable presumption that an item properly mailed was received by the addressee, *Konst v. Florida East Coast Ry.*, 71 F.3d 850, 851 (11th Cir.1996), and Hunter has not offered anything more than a generalized denial to rebut Lewis's affidavit.

With respect to Brown, the affidavits of Stephanie Jimenez, another employee of defendants, establish that Brown's account records—kept in the ordinary course of business—show that she was mailed both her original cardmember agreement and the June 2000 change-of-terms notice that contained the arbitration provision.[13] Accordingly, as in *Taylor*, the court finds no ground to deny defendants' motion on this basis.

### 2. Meaningful Notice

■ Plaintiffs argue that no arbitration agreements exist because they were not given meaningful notice that their cardmember agreements or change-of-terms notices contained arbitration provisions. The gist of plaintiffs' argument is that the arbitration provisions in their agreements were in fine print. For the reasons stated in *Taylor*, 325 F.Supp.2d at 1311–1312, this argument is foreclosed by *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996).

### 3. Reasonable Mechanism for Assent

■ Plaintiffs next argue that they did not assent to the arbitration provisions in their cardmember agreements because the

---

**12.** Lewis Aff. at ¶ 4; Defendant's Reply Memo., etc., filed July 15, 2003, Suppl. Aff. of Cynthia Lewis, at ¶ 3.

**13.** Jimenez Aff. at ¶ 5; Def.'s Reply Memo., etc., filed July 15, 2003, Suppl. Aff. of Stephanie Jimenez, at ¶¶ 4, 7.

agreements did not provide a reasonable mechanism for their assent. Plaintiffs contend that their use of their credit cards cannot be understand as indicating their assent to be bound by the terms of the cardmember agreements.

For the reasons stated in *Taylor*, 325 F.Supp.2d at 1312–1314, the court finds that as a general matter of law, and as a matter of Alabama law, plaintiffs' use of their credit cards signaled their assent to the terms of the cardmember agreements. Furthermore, to the extent that the cardmember agreements at issue in this case are governed by Nevada law, its laws explicitly provide that "[a] cardholder shall be deemed to have accepted the written terms and conditions provided by the issuer upon subsequent actual use of the credit card." Nev.Rev.Stat. 97A.140.2.

#### 4. Illusory Agreement

■ Plaintiffs next argue that the cardmember agreements between themselves and defendants are illusory because they include provisions that allow defendants to add provisions to the agreements unilaterally. For the reasons given in *Taylor*, 325 F.Supp.2d at 1314–1316, this argument is unavailing because it contravenes the *Prima Paint* rule that arguments that go to the existence of a contract as a whole are to be resolved by the arbitrator and not the court.[14]

#### 5. Motion for Jury Trial

■ Plaintiffs Brown and Hunter (and not plaintiff Lawrence) separately filed a motion for a jury trial on the question of whether agreements to arbitrate exist between themselves and defendants. The FAA provides that "[i]f the making of the arbitration agreement ... be in issue, the party alleged to be in default may ... demand a jury trial of such issue." 9 U.S.C.A. § 4. To warrant a jury trial, the party seeking to avoid arbitration must "unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial." *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 818 (11th Cir.1993) (internal quotation omitted). The party challenging the arbitration provision must create a genuine issue of fact by presenting "enough evidence to make the denial colorable." *Chastain v. The Robinson–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir.1992). For the reasons given above, and as in *Taylor*, there is nothing left of plaintiffs Brown and Hunter's arguments to send to a jury.

#### B. Vindication of Statutory Rights

■ Plaintiffs' second argument in opposition is that if they are required to go to arbitration, the provisions in their arbitration agreements barring class arbitration will prevent them from vindicating their rights under TILA and FCBA. As stated above, plaintiffs' argument differs slightly from the argument made by the plaintiff in *Taylor*. In *Taylor*, the plaintiff argued that the costs of class arbitration were prohibitively high, while, in this case, plaintiffs are arguing that the arbitration agreements themselves actually prohibit class arbitration. For purposes of addressing this argument, the court will assume—as plaintiffs themselves do—that plaintiffs' arbitration agreements bar class

---

**14.** This argument is also unavailing because Alabama law explicitly allows credit card companies to amend cardmember agreements in exactly the manner provided for in plaintiffs' cardmember agreements. 1975 Ala. Code § 5–20–5; *SouthTrust Bank v. Williams*, 775 So.2d 184, 190 (Ala.2000). The same is true in Nevada. Nev.Rev.Stat. 97A.140.4. Thus, defendants properly added arbitration provisions to plaintiffs' cardmember agreements.

arbitration.[15]

Notwithstanding this difference, plaintiffs' argument still fails. As explained in *Taylor*, 325 F.Supp.2d. at 1316–1319, the United States Court of Appeals for the Eleventh Circuit has considered and rejected the very argument plaintiffs are making. *Randolph v. Green Tree Fin. Corp.-Alabama*, 244 F.3d 814 (11th Cir. 2001). The question before the Eleventh Circuit in *Randolph* was "whether an arbitration agreement that bars pursuit of classwide relief for TILA violations is unenforceable for that reason." *Id.* at 816. The court concluded that "a contractual provision to arbitrate TILA claims is enforceable even it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA." *Id.* at 819. Thus, based on *Randolph* and for the reasons articulated in *Taylor*, the court finds plaintiffs' arguments here unavailing.

### C. Unconscionability

Plaintiffs' next argument is that the arbitration provisions in their cardmember agreements are unconscionable under generally applicable Alabama contract law because they effectively preclude them from bringing an action to enforce their rights. Citing *Leonard v. Terminix Int'l Co.*, 854 So.2d 529 (Ala.2002), plaintiffs argue that their arbitration agreements bar them from bringing class arbitrations and the costs of bringing their individual claims in arbitration will be greater than the amount they are likely to recover. This argument is the same as the one made in *Taylor*. *See* 325 F. Supp 2d. at 1319.

As in *Taylor*, this case is distinguishable from *Leonard*. Unlike in *Leonard*, there is no claim here that plaintiffs' arbitration agreements limit the damages they can

recover and no argument that their arbitration agreements limit their ability to recover their costs and fees. Accordingly, this argument does not provide plaintiffs with relief. *See Taylor*, 325 F.Supp.2d at 1321.

### D. Waiver and Judicial Estoppel

In a supplemental filing, plaintiffs raise two arguments not presented in the *Taylor* case. First, plaintiffs argue that because defendants agreed to a class-action settlement in the *Shea* litigation, they have waived their arbitration defense. Second, plaintiffs argue that, as a result of the *Shea* settlement, defendants are judicially estopped from pursuing their arbitration defense. The court is not persuaded by either argument.

#### 1. Waiver

■ "[A]n agreement to arbitrate, 'just like any other contract . . ., may be waived.'" *Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1315 (11th Cir.2002) (quoting *Burton–Dixie Corp. v. Timothy McCarthy Const. Co.*, 436 F.2d 405, 407 (5th Cir.1971)). Indeed, the FAA provides that litigation may be stayed pending arbitration only if "the applicant for the stay is not in default in proceeding with such arbitration," 9 U.S.C.A. § 3, and the Eleventh Circuit has "clarified that the term 'default' carries the same meaning as 'waiver.'" *Ivax Corp.*, 286 F.3d at 1315 n. 17.

■ The Eleventh Circuit has established a two-part test to determine whether a party has waived its right to arbitrate. First, the court must decide "if, 'under the totality of the circumstances,' the party 'has acted inconsistently with the arbitration right.'" *Ivax Corp.*, 286 F.3d at 1315–16 (quoting *S & H Contractors, Inc.*

---

**15.** The court does not decide whether the arbitration agreements at issue here actually bar class arbitration; that is a job for the

arbitrator. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 451–53, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003).

v. A.J. Taft Coal Co., 906 F.2d 1507, 1514 (11th Cir.1990)). Second, the court looks at whether, by so acting, the party seeking arbitration has in some way prejudiced the other party. Id. at 1316.

■ Plaintiffs argue that, by resolving the Shea case by means of a class settlement in the Circuit Court in California and by including the federal claims at issue in this case in the Shea settlement, defendants have acted in a manner inconsistent with their arbitration right. Plaintiffs claim that this inconsistency prejudices them in three ways: (1) defendants' "attempt to use Shea as a sword to cut off all payment posting claims, while at the same time insisting on arbitration as a shield in this case against such claims, plainly prejudices" them; (2) plaintiffs will be required to intervene in the Shea litigation; and (3) plaintiffs have "been caused to expend considerable time, delay, legal resources and energy contesting the arbitration issue in this case." [16]

It is entirely possible that the Shea settlement, should it be finally approved, will negatively impact plaintiffs' case. However, for a number of reasons, defendants' conduct does not amount to a waiver of their arbitration rights. First, defendants have not acted inconsistently with respect to arbitration. They moved to compel arbitration shortly after removing this case to federal court and before any litigation activity occurred, and, as plaintiffs themselves point out, defendants originally moved to compel arbitration in Shea, but their motion was denied. See Shea v. Household Bank, 105 Cal.App.4th 85, 129 Cal.Rptr.2d 387 (2003). Thus, in both cases, defendants have, before anything else, sought to enforce their arbitration agreements.

Second, for policy reasons, courts generally do not interpret a party's efforts to settle a case as waiving its right to compel arbitration. See, e.g., Walker v. J.C. Bradford & Co., 938 F.2d 575, 578 (5th Cir. 1991); Carbajal v. Household Bank, 2003 WL 22159473, *10 (N.D.Ill.2003); Bischoff v. DirecTV, Inc., 180 F.Supp.2d 1097, 1113 (C.D.Cal.2002). As the Fifth Circuit wrote in Walker, "[o]ffers to settle, like arbitration, are to be favored, as they encourage, the amicable and quick settlement of suits outside the judicial system." 938 F.2d at 578. To hold that a defendant waives its right to compel arbitration in one case by entering a judicial settlement in another case would create a disincentive to settle for any defendant facing multiple suits. Such an outcome is to be avoided.

Indeed, at least two courts have rejected just the argument plaintiffs are making here, concluding that a party's settlement in one case does not amount to a waiver of its right to arbitrate in another case. See Bischoff v. DirecTV, Inc., 180 F.Supp.2d 1097, 1113 (C.D.Cal.2002) ("[T]o hold that defendant can no longer assert its right to compel arbitration simply because it did not assert that right in another case is absurd."); see also Carbajal v. Household Bank, 2003 WL 22159473, at *12 n. 8 (N.D.Ill.2003) (even if defendants tried to include plaintiff's claim in a settlement in a separate case, "that does not lead to the conclusion they were intending to waive their arbitration rights.").

Finally, to find waiver, plaintiffs must have been prejudiced by defendants' inconsistency or change in tactics. Yet, even if the court were convinced that defendants acted inconsistently, that inconsistency has not prejudiced plaintiffs. Plaintiffs argue that they are prejudiced because defendants are using the Shea settlement as a "sword" to cut off their claims. It is likely

16. Suppl. Opp. at 6–7.

true that defendants intend to use the *Shea* settlement to cut off pending claims, but this would be equally true if defendants had not moved to stay this case pending arbitration. Thus, it is not the fact that defendants are settling *Shea* in court and trying to compel arbitration here that creates a problem for plaintiffs; it is the *Shea* settlement itself that is the problem for them. Likewise, plaintiffs argue that they will be required to intervene in *Shea*; however, this would be equally true if there was no arbitration issue in this case. Finally, plaintiffs argue that they have had "to expend considerable time, delay, legal resources and energy contesting arbitration," but they would have spent the same time and money contesting arbitration if the *Shea* case did not exist. Thus, the court cannot find any prejudice to plaintiffs traceable to defendants' alleged inconsistency.

Put another way, plaintiffs' real concern here is not that defendants have changed positions or taken inconsistent positions with respect to arbitration. Rather, they are concerned that the *Shea* settlement will bar their claims or those of their would-be class members. While this is a valid concern from the plaintiffs' perspective, it is not a reason to find that defendants waived their right to arbitrate the disputes here.

### 2. Judicial Estoppel

■■■■ Plaintiffs also argue that defendants are judicially estopped from asserting their arbitration rights in this case. Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire*

*v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (internal quotation omitted). The doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* (internal quotation omitted). The purpose of the doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749–50, 121 S.Ct. at 1814 (quotations and citations omitted). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Id.* at 750, 121 S.Ct. at 1815.

■■■ The court is not persuaded that defendants should be estopped from enforcing their arbitration agreements. First, as stated, defendants have not taken inconsistent positions; they have consistently attempted to enforce their arbitration agreements. Furthermore, there is no threat to the integrity of the judicial process here. That defendants are trying to settle *Shea* does not mean that this court has been misled about defendants' interest in arbitration. The vicissitudes of litigation often require that a party, for any number reasons, submit to settlement. This is true when the party still believes it has winning arguments to make, and it is even more true when, as in *Shea*, the party has suffered an important strategic loss. Thus, the court declines to find that defendants are judicially estopped from enforcing their arbitration provisions.

### E. Stay as to Lawrence

The last question before the court is whether this action should be stayed only as to Brown and Hunter—both of whom have arbitration provisions in their cardmember agreements—or as to all plain-

tiffs, including Lawrence who does not have an arbitration provision in her cardmember agreement.

Defendants cite authority for the proposition that in cases where only some of the parties have contracted to arbitrate, "a stay as to all issues, and as to all parties, is warranted when questions of fact common to all would be involved in both the litigation and arbitration." *Bischoff v. DirecTV, Inc.,* 180 F.Supp.2d 1097, 1114 (C.D.Cal.2002). Indeed, the Supreme Court has noted that "[i]n some cases ... it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court ... as a matter of its discretion to control its docket." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.* 460 U.S. 1, 21 n. 23, 103 S.Ct. 927, 939 n. 23, 74 L.Ed.2d 765 (1983). In *Bischoff,* the court acknowledged that the results of the arbitration would not be binding on the parties not required to arbitrate, but concluded that "a failure to stay the action may lead to inconsistent findings which will hinder the pursuit of judicial efficiency." 180 F.Supp.2d at 1114. Defendants argue that because, as between Lawrence's claim and Brown's and Hunter's claims, there are common issues of law and fact, the court should stay the entire proceeding.

■■■ The court is not persuaded that a stay as to all parties is warranted. The court agrees that the three plaintiffs' claims all involve common questions of law and fact. However, it is not clear why this fact increases the chance of inconsistent findings, and, it is not clear why a stay as to Lawrence's claim will reduce the chance of inconsistent findings. If the court stays the entire proceeding pending Brown and Hunter's claim, it will still eventually have to resolve Lawrence's claim; when it does so, it will not be bound by the outcome of the arbitration of Brown and Hunter's claims. Thus, if the court and the arbitrator are likely to reach inconsistent results proceeding concurrently, there is no reason why that risk is lessened if the arbitrator and the court proceed consecutively. Neither defendants, nor the opinions to which they cite, explain why this might be so.

Furthermore, the central rationale for staying proceedings under the FAA is that the parties agreed to arbitrate their dispute; indeed, it is a central tenet of the of the law of arbitration that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). However, Lawrence never agreed to arbitrate her claims against defendants; in such a case, the court requires a more convincing reason to compel arbitration than the specter of inconsistent findings floated by defendants. Nor does some arguable distant version or modification of the general concept of equitable estoppel apply here. *See Ex parte Stamey,* 776 So.2d 85, 89 (Ala. 2000) (under a theory of equitable estoppel, a non-signatory may enforce an arbitration provision for "claims that are ... 'intimately founded in and intertwined with' the claims made by the party resisting arbitration against a party that is a signatory to the contract"). Lawrence's claims are not intimately founded in and intertwined with Brown's and Hunter's claims or the defenses to their claims. Accordingly, the court will not stay Lawrence's claim.

## IV. CONCLUSION

The court will thus grant defendants' motion to stay the proceedings as to plaintiffs Brown and Hunter, but the court will deny its motion to stay as to plaintiff Law-

rence. Plaintiffs Brown and Hunter's motion for a jury trial on the arbitration issue will be denied. An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) Defendants Household Bank (SB), N.A. and Household Credit Services, Inc.'s motion to stay proceedings in favor of arbitration (doc. no. 11) is granted as to plaintiffs Kari Brown's and Abe Hunter's claims and is denied as to plaintiff Reather Lawrence's claims.

(2) Plaintiffs Brown and Hunter are ENJOINED and RESTRAINED from failing to arbitrate forthwith their claims against defendants Household Bank (SB), N.A. and Household Credit Services, Inc.

(3) Plaintiffs Brown and Hunter's motion for a jury trial on the issue of arbitrability (doc. no. 17) is denied.

(4) This case will proceed as to the claims brought by plaintiff Lawrence.